790 A.2d 57

## DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONAL SERVICES

v.

**Joseph William BEARD and Mary W. Owens, Personal Representatives of the Estate of Jeffrey Beard.**

No. 306, Sept.Term, 2000.

Court of Special Appeals of Maryland.

Jan. 30, 2002.

286

Michele J. McDonald, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), for appellant.

David V. Diggs (Kahn, Smith & Collins, P.A., on the brief), Baltimore, for appellee.

Argued before HOLLANDER, KRAUSER, and ROBERT N. DUGAN (Specially assigned), JJ.

KRAUSER, Judge.

The issue before us is whether the Department of Public Safety and Correctional Services, appellant, can terminate the employment of a Drinking Driver Monitor because he was convicted of driving while under the influence of alcohol. The answer to that question is neither as simple nor as predictable as it might appear at first blush.

Our review of relevant law reveals, on the one hand, an Executive Order that imposes a progressive scheme of disciplinary action and appears to prohibit termination for a first offense of this nature, and, on the other, an administrative regulation that mandates automatic termination for such an offense. The relationship between the two lies at the core of this appeal. It is our task to determine which governs appellant's dismissal and to what effect. In the course of doing so, we hope to clarify the nature of executive orders and their relationship to regulations propounded by state agencies.

The employee, whose misadventure gave rise to this case, was Jeffrey Beard. Mr. Beard's employment as a Drinking

Driver Monitor with appellant was terminated when he was convicted of driving while under the influence of alcohol by the District Court for Allegany County. Beard appealed that termination to the Secretary of Budget and Management, who referred the matter to the Office of Administrative Hearings. A hearing was then held before an Administrative Law Judge ("ALJ"). Citing Executive Order 01.01.1991.16, containing Maryland's Substance Abuse Policy for Executive Branch employees, the ALJ ordered, among other things, that Beard's termination be reversed and that he be reinstated under certain conditions. Following that decision, appellant filed a petition for judicial review in the Circuit Court for Baltimore City. That court, after conducting a hearing, affirmed the ALJ's decision. Appellant then noted this appeal.

While this appeal was pending, Mr. Beard passed away. Thereafter, counsel for Mr. Beard filed a motion to substitute the estate of Mr. Beard as appellee. We granted that motion and ordered that Joseph William Beard and Mary W. Owens, personal representatives of the Estate of Jeffrey Beard, be substituted as appellees.

Appellant presents three questions for our review. They are:

I. Did the administrative law judge err in holding that the Substance Abuse Policy, contained in Executive Order 01.01.1991.16, applied to the termination of appellee's state employment as a Drinking Driver Monitor?

II. Did the administrative law judge err in holding that the Substance Abuse Policy prevented the termination of appellee's employment?

III. Did the administrative law judge err by reinstating appellee under certain conditions with back pay rather than remanding the case to the Division of Parole and Probation for disposition?

For the reasons that follow, we hold that the ALJ did not err in applying the disciplinary provisions of the Substance Abuse Policy to the case *sub judice*. That policy, promulgated

by Executive Order 01.01.1991.16, is applicable to an employee of the Executive Branch of State Government who is convicted [1] of an "off-the-workplace alcohol driving offense." And it governs the disciplinary actions that may be taken against such an employee for that offense.

We further hold that the ALJ correctly concluded that the Substance Abuse Policy prohibited appellant from terminating Beard's employment for his first conviction of an "off-the-workplace alcohol driving offense." Finally, we conclude that the ALJ did not exceed his authority by conditionally reinstating Beard with back-pay rather than remanding the matter to the appointing authority,[2] the Division of Parole and Probation, a unit within the Department of Public Safety and Correctional Services.

## BACKGROUND

The facts of this case are not in dispute. In 1994, Beard began working as a Drinking Driver Monitor for the Department of Public Safety and Correctional Services ("DPSCS"), Division of Parole and Probation ("DPP"). He was hired as a "Monitor II," a position that is classified as "sensitive" [3] and

---

1. Because probations before judgment are frequently granted by trial courts in such situations, we note that, pursuant to State Personnel and Pensions § 2–306(D)(1) of the Maryland Code Annotated, (1993, 1997 Repl.Vol., 2001 Cum.Supp.), a probation before judgment may be considered as a conviction for disciplinary purposes under the Substance Abuse Policy if: "(1) the employee receives probation before judgment in a substance abuse offense; and (2) the appointing authority can demonstrate a relationship between that substance abuse offense and the employee's job responsibilities."

2. An "[a]ppointing authority" is "an individual or a unit of government that has the power to make appointments and terminate employment." Md.Code Ann. (1993, 1997 Repl.Vol., 2001 Cum.Supp.), § 1–101(b) of the State Pers. & Pens. Article.

3. The Substance Abuse Policy defines "sensitive employee" as an "employee whose classification or position has been designated sensitive by the employee's appointing authority or personnel system." COMAR 01.01.1991.16 A(7).

that falls within the "skilled and professional services." [4] As a monitor, Beard was responsible for supervising "drinking driver offenders" assigned to him. His duties included ensuring that offenders complied with the conditions of their probation, making certain that they attended required treatment and counseling programs, and recognizing signs that the offender had resumed drinking so he or she could be placed in a treatment program.

Before becoming a monitor, Beard himself had had a history of alcohol abuse. In applying for that position, Beard disclosed that, on four occasions, he either had been either convicted of or had received probation before judgment for driving under the influence of alcohol or driving while intoxicated. That, however, was not a bar to his employment as a monitor. In fact, the Director of the DPP testified before the ALJ that the hiring of past offenders as monitors in the Drinking Driver Monitor Program is "encouraged." Those with histories of alcohol abuse, the Director stated, are more likely to recognize when an offender has resumed drinking as well as serve as positive role models for the people that they monitor.

Beard had remained sober for the six years preceding his employment as a monitor. Four years later, however, in August of 1998, Beard experienced a relapse and was hospitalized. Beard reported his relapse to his supervisors at the DPP. No disciplinary action was taken. After being discharged from the hospital, however, Beard relapsed again and between September and November of 1998 drank alcoholic beverages on at least six occasions.

On the evening of November 8, 1998, after drinking beer at his home in Allegany County, Maryland, Beard drove to a fast food restaurant. While in the "drive-thru" lane of that restaurant, Beard's car bumped into the car in front of him. The police were called, and Beard was arrested and charged with,

---

4. The skilled and professional services are described in State Personnel and Pensions §§ 6–401 and 6–402 of the Maryland Code Annotated (1993, 1997 Repl.Vol., 2001 Cum.Supp.).

among other things, driving under the influence of alcohol. On March 18, 1999, Beard appeared before the District Court for Allegany County and pleaded guilty to driving under the influence of alcohol. The court accepted his plea and convicted him of that offense. Beard was sentenced to a term of one year imprisonment. That sentence was suspended, and he was placed on three years of unsupervised probation, and ordered to pay fines and court costs, attend counseling, and serve six months of home detention with permission to go to work.

Beard reported his arrest to the DPP and was thereafter placed on administrative leave. The DPP then sent a "notice of termination" to Beard. In that notice, the DPP charged Beard with violating Section II, paragraphs B.1[5] and B.10,[6] and Section IV, paragraphs H.1[7] and H.2[8] of the DPSCS Standards of Conduct Manual, ("DPSCS Manual") as well as the following provisions of the Code of Maryland Regulations ("COMAR"): 17.04.05.04 B(3), 17.04.05.04 B(8), and 17.04.05.04

---

**5.** Paragraph B.1 provides that:

Each employee shall conduct him/herself at all times, both on and off duty, in such a manner as to reflect most favorably on the Department. Any breach of the peace, neglect of duty, misconduct or any conduct on the part of any employee of the Department, either within or outside of his/her place of employment, which tends to undermine the good order, efficiency, or discipline of the Department, or which reflects discredit upon the Department or any employee thereof, or which is prejudicial to the efficiency and discipline of the Department, even though these offenses may not be specifically enumerated or stated, shall be considered conduct unbecoming an employee of the Agency, and subject the employee to disciplinary action by the Agency.

**6.** Paragraph B.10 provides in part that "[a]n employee may not violate any state, federal or local law."

**7.** Paragraph H.1 provides that:

An Agency Head has the authority to approve or impose any reasonable disciplinary action regardless of the provisions of Section III. E, F or G, except those provisions required by Executive Order.

**8.** Paragraph H.2 provides that:

Any arrest or conviction not listed above may also result in disciplinary action or termination from State service.

B(15).[9] At the hearing before the ALJ, appellant conceded that the DPSCS Manual contains disciplinary provisions pertaining to alcohol driving offenses that are virtually identical to the schedule of disciplinary measures contained in Executive Order 01.01.1991.16, which appellant now argues was erroneously applied by the ALJ to the case. In addition to listing the charges against Beard, the notice of termination explained why termination was appropriate, stressing Beard's plea of guilty to driving under the influence of alcohol and noting that Beard "consciously attempted to calculate the amount of alcohol he had consumed and when he would be below the legal limit of intoxication." It further noted that police found an open container of alcohol in his car at the time of his arrest. It asserted that "Beard's ability to effectively monitor the behavior of those that he is charged with is seriously questioned given the fact that he has to be similarly monitored."

Pursuant to State Personnel and Pensions ("SPP")(1993, 1997 Repl.Vol., 2001 Cum.Supp.), § 11–110 of the Maryland Code Annotated, Beard appealed his termination to the Secretary of Budget and Management, who referred the matter to the Office of Administrative Hearings, and a hearing was held

---

9. COMAR 17.04.05.04 B(3) provides that an employee may be disciplined for "[b]eing guilty of conduct that has brought or, if publicized, would bring the State into disrepute." COMAR 17.04.05.04 B(8) authorizes disciplinary action when an employee "[engages] in conduct involving dishonesty, fraud, deceit, misrepresentation, or illegality." COMAR 17.04.05.04 B(15) provides that an employee may be disciplined for "[c]ommitting another act, not previously specified, when there is a connection between the employee's activities and an identifiable detriment to the state." These regulations were adopted by the Secretary of Budget and Management, and apply to employees within the State Personnel Management System. COMAR 17.04.05 (listing as authority for the regulations the "State Personnel and Pensions Article, § 4–106 and Title 11, Annotated Code of Maryland"); *see also* Md.Code Ann. (1993, 1997 Repl.Vol., 2001 Cum.Supp.), § 11–102 of the State Pers. & Pens. Article (stating that subtitle 1 of Title 11, "applies to all employees in the State Personnel Management System within the Executive Branch except temporary employees"). There is no dispute that Beard's position was within the State Personnel Management System, and was thus subject to the above mentioned COMAR regulations.

before an ALJ. At that hearing, appellant stipulated that "the Executive Order ... Maryland Substance Abuse Policy 01.01.1991.16 has the effect of law ... [a]nd as such, outweighs any particular agency's policies." That stipulation, we note, is contrary to its present position. Following that hearing, the ALJ issued a decision reversing Beard's termination.

In that decision, the ALJ determined that Beard's "conduct constituted a violation of COMAR 17.04.05.04B(3) and CO-MAR 17.04.05.04B(8) or, in the alternative, the Standards of Conduct contained in the DPSCS Standards of Conduct Manual, Section II, Paragraphs B.1 and B.10," but concluded that termination was not an appropriate disciplinary action. The ALJ reasoned that "[a]lthough management can impose disciplinary action against an employee under other, more general, prohibitions against improper conduct ... the measure of that discipline is circumscribed by the specific pronouncements contained in the State of Maryland Substance Abuse Policy." Under those provisions, he concluded, termination of state service was not an authorized sanction for Beard's first conviction for an off-the-workplace alcohol driving offense while a state employee.

Declaring the DPP's termination of Beard to be "contrary to applicable State regulations and established agency policy" and thus "an abuse of discretion," the ALJ ordered that Beard be "restored to a duty status as a Monitor II in the Drinking Driver Monitor Program," that he "be awarded back pay retroactive from April 1, 1999, up to and including the date of [the] decision," and that the DPP "immediately refer [Beard] to the Employee Assistance Program." As the Substance Abuse Policy requires that "[a]ll employees in the workplace must be capable of performing their duties," the ALJ also ordered that Beard's reinstatement "as a Monitor II" was "condition[ed] upon him being able to demonstrate, to the satisfaction of the DPP, that he is abstaining from the use of any alcoholic beverages, his current participation in, or recent completion of, a certified alcoholic treatment program, his ongoing participation in Alcoholics Anonymous or another acceptable self-help group, and his compliance with any addi-

tional recommendations made by the Employee Assistance Program."

Thereafter, appellant filed a petition for judicial review in the Circuit Court for Baltimore City. After a hearing on that petition, the circuit court issued an order affirming the decision of the ALJ. In that order, the circuit court determined that in light of a "stipulation entered on the record before the ALJ ... the Executive Order has the effect of law and outweighs any particular agency's policies," the ALJ was "correct in holding that termination was not an appropriate disciplinary action under the facts of this case." The court added that it did "not believe that the decision not to charge respondent under the Executive Order's terms relieves the agency of its obligation to abide by clearly applicable limits on its disciplinary authority." The circuit court concluded that "the ALJ was not merely substituting his judgment with respect to the appropriate sanction for that of the agency." "Rather," according to the court, the ALJ was "requiring the agency to comply [ ] with an overriding legal stricture, which the ALJ correctly found to be applicable to the agency's disciplinary actions." Dissatisfied with the circuit court's affirmance of the ALJ's decision, appellant noted this appeal.

## DISCUSSION

Appellant contends that the ALJ erred as a matter of law in three ways: first, by applying the Substance Abuse Policy, contained in Executive Order 01.01.1991.16, to the case *sub judice;* second, by interpreting the provisions of that policy to preclude Beard's termination; and third, by fashioning sanctions for Beard rather than remanding this case to allow the DPP, Beard's appointing authority, to assess and impose appropriate sanctions.

■■■ In addressing these claims, we review "the decision of the ALJ, not the decision of the trial court." *Abbey v. University of Maryland,* 126 Md.App. 46, 53, 727 A.2d 406 (1999) (citing *Public Serv. Comm'n v. Baltimore Gas & Elec. Co.,* 273 Md. 357, 362, 329 A.2d 691 (1974); *Consumer Protec-*

*tion Div. v. Luskin's, Inc.,* 120 Md.App. 1, 22, 706 A.2d 102 (1998), *rev'd in part on other grounds, Luskin's, Inc. v. Consumer Protection Div.,* 353 Md. 335, 726 A.2d 702 (1999)). In reviewing that decision, we apply "the same statutory standards as the Circuit Court." *Gigeous v. Eastern Correctional Inst.,* 363 Md. 481, 495, 769 A.2d 912 (2001). Accordingly, we may "reverse or modify the decision if any substantial right of the petitioner may have been prejudiced because a finding, conclusion, or decision: (i) is unconstitutional; (ii) exceeds the statutory authority or jurisdiction of the final decision maker; (iii) results from an unlawful procedure;(iv) is affected by any other error of law;(v) is unsupported by competent, material, and substantial evidence in light of the entire record as submitted; or (vi) is arbitrary or capricious." Md.Code Ann. (1984, 1999 Repl.Vol., 2001 Cum.Supp.), § 10–222(h)(3) of the State Government Article ("SG"). In brief, our role "is limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law." *United Parcel Serv., Inc. v. People's Counsel,* 336 Md. 569, 577, 650 A.2d 226 (1994).

Because there is no dispute here as to the substantiality of the evidence, we review the ALJ's decision only to determine if it is "premised upon an erroneous conclusion of law." Applying that standard, we conclude that the ALJ's decision is not so premised and shall affirm the judgment of the circuit court.

We now turn to the three claims advanced by appellant.

# I.

Appellant contends that the ALJ erred by applying the Substance Abuse Policy to the case *sub judice.* According to appellant, the ALJ's decision was based upon a "misconception" that the Substance Abuse Policy "preempts any other statute, regulation or policy under which Beard's conduct may be subject to discipline." The latter claim is more than a little

curious given that appellant stipulated before the ALJ that Executive Order 01.01.1991.16, which embodies the Substance Abuse Policy, "has the effect of law . . . [a]nd as such, outweighs any particular agency's policies." We shall nonetheless address this issue to clarify the nature of Executive Order 01.01.1991.16, its relationship to applicable statutes and CO-MAR regulations, and its effect upon disciplinary actions that may be imposed upon Executive Branch employees who are convicted of "off-the-workplace alcohol driving offenses."

"[T]he Governor, as the head of the Executive Branch, has broad powers with respect to Executive Branch State employees. . . ." *Maryland Classified Employees Assoc., v. Schaefer,* 325 Md. 19, 34, 599 A.2d 91 (1991); *see also McCulloch v. Glendening,* 347 Md. 272, 284, 701 A.2d 99 (1997) (noting the Governor of Maryland "has a significant role in setting policies to govern the management and supervision of State employees"). The Governor's authority over the Executive Branch and its employees is rooted in Maryland's Constitution and statutory law. *McCulloch,* 347 Md. at 284–85, 701 A.2d 99. Article II, § 9 of the Constitution of Maryland requires the Governor to "take care that the Laws are faithfully executed," and Article II, § 1 of the Constitution of Maryland provides in part that "[t]he executive power of the State shall be vested in a Governor." Md.Code Ann. (1981 Repl.Vol., 2001 Cum.Supp.) of the Const. Article. *See also McCulloch,* 347 Md. at 282–83, 701 A.2d 99 (stating that the Governor's executive power can be found in two sections of the Maryland Constitution, "namely, Article II, § 1 . . . and Article II, § 9"). "Entirely consistent with, and complementary of the Governor's executive power under Article II, § 1, the General Assembly has, through enactment of Md.Code (1957, 1995 Repl.Vol.) § 3–302 of the State Govt. Article, entrusted to the Governor the power to establish personnel policies and to require executive agency heads to carry out those policies." *McCulloch,* 347 Md. at 284–85, 701 A.2d 99. SG § 3–302 provides that "[t]he Governor is the head of the Executive Branch of the State government and, except as otherwise provided by law, shall supervise and direct the officers and units in that Branch."

In the exercise of that authority, the Governor may issue executive orders. The authority to issue those orders is found in both Maryland's Constitution [10] and statutory law. *Lomax v. Warden*, 120 Md.App. 314, 331, 707 A.2d 395 (1998) (citing Article II, § 24 of the Maryland Constitution and SG § 3–401).

■ Constitutionally authorized executive orders have the force of law, but so may statutorily authorized executive orders, as we noted in *Lomax v. Warden*, 120 Md.App. 314, 333 n. 8, 707 A.2d 395. (1998), *aff'd*, 356 Md. 569, 741 A.2d 476 (1999). There, we observed that executive orders "promulgated pursuant to Article II, section 24 of the Maryland Constitution have the 'force of law' " as well as statutorily authorized executive orders as long as "[u]pon issuance . . . , the Governor [ ] deliver[s] the original or a certified copy of it to the Secretary of State," SG § 3–404(a), and " 'as long as they are not inconsistent with existing statutes and are within the scope contemplated by the specific enabling legislation.' " *Lomax*, 120 Md.App. at 333 n. 8, 707 A.2d 395. (quoting 64 Op. Att'y Gen. 180 (1979)).

The Substance Abuse Policy is set forth in Executive Order 01.01.1991.16, which is printed in COMAR 01.01.1991.16.[11] The Order's promulgation clause states that it is being issued "by virtue of the authority" vested in the Governor "by the Constitution and laws of Maryland." The statutory authority for the Order lies within two provisions of the State Govern-

---

10. Article II, § 24 of the Maryland Constitution provides:

 The Governor may make changes in the organization of the Executive Branch of the State Government . . . Where these changes are inconsistent with existing law, or create new governmental programs they shall be set forth in executive orders in statutory form which shall be submitted to the General Assembly. . . . An executive order that has been submitted shall become effective and have the force of law on the date designated in the Order unless specifically disapproved . . . by a resolution of disapproval concurred in by a majority vote of all members of either House of the General Assembly.

11. "The Administrative Procedure Act requires that '[e]ach executive order that is generally permanent in nature' be printed in the Code of Maryland Regulations." COMAR 01.01 (quoting Md.Code Ann. (1984, 1999 Repl.Vol.), § 7–205(a)(1) of the State Gov't Article.)

ment Article of the Maryland Code Annotated: SG §§ 3–302 and 3–401. SG § 3–302 states that "[t]he Governor is the head of the Executive Branch of State government and, except as otherwise provided by law, shall supervise and direct the officers and units in that Branch." And SG § 3–401(2) states that executive orders may "adopt[ ] guidelines, rules of conduct, or rules of procedure for: (i) State employees; (ii) units of the State government; or (iii) persons who are under the jurisdiction of those employees or units or who deal with them." Because Executive Order 01.01.1991.16 is authorized by statute, specifically SG § 3–302 and SG § 3–401(2), and because the Governor delivered it to the Secretary of State as required by SG § 3–404(a), it has the " 'force of law' " to the extent that it is not " 'inconsistent with existing statutes.' " *Lomax*, 120.Md.App. at 333 n. 8, 707 A.2d 395 (quoting 64 Op. Att'y Gen. 180 (1979)). We therefore now turn to the question of whether the Executive Order is inconsistent with any existing statutes.

Executive Order 01.01.1991.16 became effective on April 1, 1991. After the issuance of that Order, the State Personnel Management System was revised by the State Personnel Management System Reform Act of 1996 ("Act"). *See Western Correctional Inst. v. Geiger,* 130 Md.App. 562, 747 A.2d 697 (2000) (chronicling the history of the Act). That Act, among other things, added several sections to Title 11 of the State Personnel and Pensions Article. *Id.* Two of those sections, SPP § 11–104 and SPP § 11–105, specifically address employee termination. The former contains various disciplinary actions that may be taken with respect to a state employee. It provides that, "with prior approval of the head of the principal unit," an appointing authority may "(i) terminate the employee's employment." SPP § 11–104(7). The latter covers automatic terminations of employment. It states:

The following actions are causes for automatic termination of employment:

(1) intentional conduct, without justification, that:

(i) seriously injures another person;

 (ii) causes substantial damage to property; or

 (iii) seriously threatens the safety of the workplace;

(2) theft of State property of a value greater than $300;

(3) illegal sale, use, or possession of drugs on the job;

(4) conviction of a controlled dangerous substance offense by an employee in a designated sensitive classification;

(5) conviction of a felony;

(6) accepting for personal use any fee, gift, or other valuable thing in connection with or during the course of State employment if given to the employee by any person with the hope or expectation of receiving a favor or better treatment than that accorded to other persons; or

(7) (i) violation of the Fair Election Practices Act; or

 (ii) using, threatening, or attempting to use political influence or the influence of any State employee or officer in securing promotion, transfer, leave of absence, or increased pay; and

(8) wantonly careless conduct or unwarrantable excessive force in the treatment or care of an individual who is a client, patient, prisoner, or any other individual who is in the care or custody of this State.

SPP § 11–105.

While this list of acts warranting automatic termination is lengthy, it does not include a conviction for driving under the influence of alcohol. In 1997, however, the Secretary of Budget and Management adopted COMAR 17.04.05.04, entitled "Disciplinary Actions Relating to Employee Misconduct." That Regulation expanded the list of "actions [that] are causes for automatic termination of employment" under SPP § 11–105.[12] It now includes, among other things, "conduct that has brought or, if publicized, would bring the State into disrepute" under COMAR 17.04.05.04(B)(3), "conduct involving dishones-

---

**12.** *See* 17.04.05.04(C) (stating that "[t]he actions in § B of this regulation are in addition to the automatic causes for termination enumerated in State Personnel and Pensions Article, § 11–105, Annotated Code of Maryland")

ty, fraud, deceit, misrepresentation, or illegality" under CO-MAR 17.04.05.04(B)(8), and conduct involving "another act, not previously specified, when there is a connection between the employee's activities and an identifiable detriment to the State." COMAR 17.04.05.04(B)(15). Appellant charged Beard with all three categories of prohibited conduct.

Unlike COMAR 17.04.05.04, which mandates "automatic termination" for prohibited behavior, Executive Order 01.01.1991.16 prescribes a schedule of progressively severe disciplinary actions for sensitive employees based on the number of convictions they have for off-the-workplace alcohol driving offences. As we shall more fully discuss in part II of this opinion, under that schedule, termination of employment is not an available sanction for a first off-the-workplace alcohol driving offense. Consequently, we must examine the relationship between COMAR 17.04.05.04 and Executive Order 01.01.1991.16 to determine which applies to appellee's conduct. Our resolution of that question will determine whether the ALJ was correct in concluding that Executive Order 01.01.1991.16 "circumscribed" the "measure of . . . discipline" that could be imposed on Beard, by eliminating the option of firing him.

 As previously discussed, a statutorily authorized executive order, such as the one before us, has the force of law to the extent that it is not inconsistent with any existing statute and is within the scope contemplated by the enabling legislation. But so does an administrative regulation have the force of law, under certain circumstances. Administrative regulations that are "legislative" rather than merely "interpretive"[13] have " 'statutory force upon going into effect.' " *Waverly Press, Inc. v. State Dept. of Assessments and Taxation,* 312 Md. 184, 191, 539 A.2d 223 (1988) (quoting *Comptroller v.*

---

13. Interpretive rules "only interpret the statute to guide the administrative agency in the performance of its duties until directed otherwise by decisions of the courts." *Comptroller v. Rockhill, Inc.,* 205 Md. 226, 234, 107 A.2d 93 (1954).

*Rockhill, Inc.,* 205 Md. 226, 234, 107 A.2d 93 (1954)). In our view, COMAR 17.04.05.04. is such a regulation.

■ In determining whether an administrative regulation is "legislative," we consider "whether it 'affects individual rights and obligations' and whether the agency intended the rule to be legislative as 'evidenced by such circumstantial evidence as the formality that attended the making of the law, including rule making procedure and publication.'" *Board of School Comm'rs. v. James,* 96 Md.App. 401, 422, 625 A.2d 361 (1993)(quoting Peter Raven Hansen, *Regulatory Estoppel: When Agencies Break Their Own "Laws,"* 64 Tex. Law Rev. 1, 16 (1985)). Because COMAR 17.04.05.04 specifies the conduct for which a state employee is subject to automatic termination, it does "affect individual rights and obligations" and thus meets the first requirement of a "legislative" regulation.

■ As to the second requirement—"whether the agency intended the rule to be legislative as 'evidenced by such circumstantial evidence as the formality that attended the making of the law, including rule making procedure and publication'"—we note that COMAR 17.04.05.04 was adopted as an emergency provision pursuant to SG § 10–111(b), and was published in both its emergency and permanent forms in the Maryland Register.[14] Moreover, COMAR 17.04.05.04 was adopted pursuant to a specific legislative grant of authority to the Secretary of Budget and Management to "adopt regulations, guidelines, or policies" to "carry out those provisions of [ ] Division I that are subject to the authority of the Secretary." SPP § 4–106(a); *see also* Davis, *Administrative Law Treatise,* Ch. 7, § 7.8 at 36 (1979) ("A legislative rule is the product of an exercise of delegated legislative power to make the law through rules. An interpretive rule is any rule an agency issues without exercising delegated legislative power to make law through rules.") Consequently, we conclude that

---

14. The emergency provision was effective on February 12, 1997, and was published at 24:5 Md. R. 391. The regulation was adopted permanently, became effective September 8, 1997, and was published at 24:18 Md. R. 1297.

COMAR 17.04.05.04 is "legislative" and accordingly has the force of law.

We are therefore faced with two competing, if not conflicting, forms of law—an executive order and a "legislative" administrative regulation—ostensibly addressing the same issue. To determine which one governs disciplinary actions that may be taken against an Executive Branch employee, covered under the State Personnel Management System, who is convicted of an alcohol driving offense, we turn to two guiding principles of statutory interpretation. The first is that when construing two statutes that involve the same subject matter, a harmonious interpretation of the statutes is "strongly favor[ed]." *Maryland State Police v. Warwick Supply & Equip. Co.*, 330 Md. 474, 483–84, 624 A.2d 1238 (1993); *see also Department of Natural Resources v. France*, 277 Md. 432, 461, 357 A.2d 78 (1976)(stating that "[w]here two statutory provisions are neither irreconcilable nor mutually repugnant, they should be construed in harmony with their respective objects and tenor") (citations omitted). The second is that where two enactments—one general, the other specific—appear to cover the same subject, the specific enactment applies. *France*, 277 Md. at 461–62, 357 A.2d 78. (" 'Where there is a specific enactment and a general enactment which, in its most comprehensive sense, would include what is embraced in the former, the particular enactment must be operative, and the general enactment must be taken to affect only such cases within its general language as are not within the provisions of the particular enactment.' ") (quoting *Criminal Injuries Comp. Board v. Gould*, 273 Md. 486, 495, 331 A.2d 55 (1975)) (internal quotations omitted); *see also Lumbermen's Mutual Casualty Co. v. Insurance Comm'r*, 302 Md. 248, 268, 487 A.2d 271 (1985)("[W]here one statutory provision specifically addresses a matter, and another more general statutory provision also may arguably cover the same matter, the specific statutory provision is held to be applicable and the general provision is deemed inapplicable.").

Applying the first principle that we should seek a harmonious interpretation of the two, we note that although COMAR 17.04.05.04, with its automatic termination provision, was promulgated after Executive Order 01.01.1991.16 and its progressive schedule of discipline, there is no indication in that regulation, or in the statute that authorized it, that it was intended to supersede the disciplinary provisions of Executive Order 01.01.1991.16. Indeed, although they appear, at first blush, to be in conflict they are not necessarily irreconcilable. Indeed, they can be harmonized by application of the second principle—where a specific enactment and a general enactment appear to cover the same subject, the specific enactment governs.

COMAR 17.04.05.04, with its automatic termination provision, applies to all state employees covered by the State Personnel Management System, not just those in the Executive Branch. In fact, it does not specifically list an alcohol driving offense as a prohibited activity and a cause for automatic termination. In contrast, Executive Order 01.01.1991.16 promulgates a disciplinary policy that applies only to state employees of the Executive Branch, and that policy specifically addresses those Executive Branch employees who abuse alcohol and are convicted of off-the-workplace alcohol driving offenses. Therefore, we conclude that the Substance Abuse Policy in Executive Order 01.01.1991.16 governs the disciplining of state employees in the Executive Branch of State Government, who commit alcohol driving offenses.

We now turn to the issue of whether, under the Substance Abuse Policy, Beard's conduct warranted termination of his employment as a Drinking Driver Monitor.

## II

Appellant contends that "the ALJ erred by misinterpreting the provisions of [the Substance Abuse Policy] to prohibit Beard's termination." In support of that claim, appellant argues that the Substance Abuse Policy requires, for a first off-the-workplace conviction, a referral to an employee assis-

tance program and "'any other appropriate disciplinary actions.'" According to appellant, the "ordinary and common meaning" of the phrase "'any other appropriate disciplinary actions' . . . is unquestionably broad enough to include termination." Appellant concludes that, instead of holding as a matter of law that termination was not an available sanction, the ALJ should have applied our analysis in *Curry v. Department of Public Safety and Correctional Servs.*, 102 Md.App. 620, 651 A.2d 390 (1994), *cert. granted*, 338 Md. 252, 657 A.2d 1182 (1995), *cert. dismissed*, 340 Md. 175, 665 A.2d 1038 (1995), to determine "whether termination was appropriate based on the severity of the conduct and surrounding circumstances." Had the ALJ applied the correct analysis, appellant asserts, he would have found that termination was "appropriate" because Beard's "inability to comply with the state drinking and driving laws compromised his ability to enforce those laws," and rendered him unable "to perform his job effectively." We hold, however, that the ALJ's interpretation of the Substance Abuse Policy is sound.

Paragraph C(4) of Executive Order 01.01.1991.16 prescribes disciplinary actions to be taken with respect to a "sensitive employee convicted of an off-the-workplace alcohol driving offense,[15] and a non-sensitive employee convicted of any alcohol driving offense." It directs that such employees shall:

(a) On the first conviction be referred to an employee assistance program, and in addition, be subject to any other appropriate disciplinary actions;

(b) On the second conviction, at a minimum, be suspended for at least 5 days, be referred to an employee assistance program, be required to participate successfully in a treatment program, and in addition, be subject to any other appropriate disciplinary actions, up to and including termination;

(c) On the third conviction, be terminated.

---

**15.** It is undisputed that appellee's position as a "Monitor II" in the Drinking Driver Monitor Program was classified as "sensitive" and that he had committed an "alcohol driving offense."

In interpreting these provisions, the ALJ observed that while both first and second convictions render an employee "subject to any other appropriate disciplinary actions," the words "up to and including termination" are present only for a second conviction. According to the ALJ, there is "only one reasonable interpretation" for this, namely, that "[t]ermination of State service is not an authorized sanction for a 'sensitive employee' for a first conviction of an off-the-workplace 'alcohol driving offense' under the State of Maryland Substance Abuse Policy." We agree.

■■■ As noted earlier, Executive Order 01.01.1991.16 is statutorily authorized and " 'the equivalent of [a] statute[ ].' " *Lomax,* 120 Md.App. at 332 n. 8, 707 A.2d 395 (1998) (quoting 64 Op. Att'y Gen. 180 (1979)). It is therefore appropriate that, in interpreting that order to determine whether termination was warranted in the instant case, we employ rules of statutory construction.

■■■ A " 'cardinal rule of statutory interpretation is to ascertain and effectuate the intention of the legislature.' " *Degren v. State,* 352 Md. 400, 417, 722 A.2d 887 (1999)(quoting *Oaks v. Connors,* 339 Md. 24, 35, 660 A.2d 423 (1995)). The centrality of that rule is by no means diminished by the fact that here it is the Executive, not the Legislature, whose intention we seek to "ascertain and effectuate."

■■■ " 'The primary source of legislative intent is . . . the language of the statute itself.' " *State v. Pagano,* 341 Md. 129, 133, 669 A.2d 1339 (1996)(quoting *Tucker v. Fireman's Fund Ins. Co.,* 308 Md. 69, 73, 517 A.2d 730 (1986)). In interpreting the words of a statute, we give "them their ordinary and natural meaning." *Whack v. State,* 338 Md. 665, 672, 659 A.2d 1347 (1995). "We neither add nor delete words to a clear and unambiguous statute to give it a meaning not reflected by the words the Legislature used or engage in a forced or subtle interpretation in an attempt to extend or limit the statute's meaning." *Taylor v. Nationsbank,* 365 Md. 166, 181, 776 A.2d 645 (2001); *see also, Board of Educ. of Garrett County v. Lendo,* 295 Md. 55, 63, 453 A.2d 1185 (1982) (stating

that we "may not insert . . . words to make a statute express an intention not evidenced in its original form"). Furthermore, a statutory provision should not be viewed in isolation. "All relevant parts . . . should be read together and, to the extent possible, construed in harmony." *Curry,* 102 Md.App. at 628, 651 A.2d 390. Finally, "if the language is clear and unambiguous, there is usually no need to look further." *Gary v. State,* 341 Md. 513, 520, 671 A.2d 495 (1996).

The language of Executive Order 01.01.1991.16 is clear and unambiguous. Paragraph B(5) states that all "[e]mployees are prohibited from," among other things, "[c]ommitting an alcohol driving offense." ¶ B(5)(c). For a "sensitive" employee convicted of an "off-the-workplace alcohol driving offense," the Order sets forth a progressive schedule of disciplinary sanctions that increase in severity with each new alcohol driving offense that an employee commits. Upon the first conviction for such an offense, the employee shall "be referred to an employee assistance program, and in addition, be subject to any other appropriate disciplinary actions." ¶ C(4)(a). Upon a second conviction, however, the employee will "be suspended for at least 5 days, be referred to an employee assistance program, [and] be required to participate successfully in a treatment program." ¶ C(4)(b). The employee will also "be subject to any other appropriate disciplinary actions, up to and including termination." *Id.* Finally, upon a third conviction, the employee shall be terminated from his employment. ¶ C(4)(c). Lest any doubt remains of the Executive's intention to create a schedule of progressive disciplinary measures to correspond with each additional alcohol offense committed, paragraph E of the Executive Order states that "[a]ny employee otherwise in violation of this Executive Order shall be subject to appropriate *progressive* disciplinary actions *up to and including* termination." (emphasis added) To hold that an employee may be terminated for a first off-the-workplace alcohol driving offense contravenes both the language and the purpose of the Order.

 Moreover, a subsection of a statute should "be read in conjunction with other subsections ... so that we may give effect to the whole statute and harmonize all of its provisions." *Gargliano v. State,* 334 Md. 428, 436, 639 A.2d 675 (1994). For a first conviction, the Executive Order authorizes "any other appropriate disciplinary actions." For a second conviction, it authorizes "any other appropriate disciplinary actions," but adds "up to and including termination." The language "up to an including termination" modifies the phrase "any other appropriate disciplinary actions." Thus, "termination" is an "appropriate" disciplinary action for a second conviction. The Order does not, however, list "termination" as an "appropriate" disciplinary action for a first conviction, and we "may not insert ... words to make a statute express an intention not evidenced in its original form." *Board of Educ. of Garrett County v. Lendo,* 295 Md. 55, 63, 453 A.2d 1185 (1982).

 In interpreting a law, we may also look beyond its language. *See Chesapeake Amusements, Inc. v. Riddle,* 363 Md. 16, 29, 766 A.2d 1036 (2001). The Substance Abuse Policy was originally promulgated on April 7, 1989 by Executive Order 01.01.1989.05. *Dashiell v. State Dept. of Health and Mental Hygiene,* 327 Md. 130, 131, 607 A.2d 1249 (1992). It was promulgated in part to comply with the "federal Anti Drug Abuse Act of 1988, 41 U.S.C. §§ 701–707, which requires states that receive federal funds to establish a drug-free workplace, a policy on use of substances, a drug awareness program for employees, and a procedure for self-reporting convictions." *Id.*

Paragraph B(7) of Executive Order 01.01.1989.05, which preceded the executive order in question, made it a violation of the Substance Abuse Policy for an employee to be convicted of an "off-the-job drug or alcohol" offense, and Paragraph (B)(11) directed that a sensitive employee found to be in violation of that Policy "will be terminated." *Id.* Executive Order 01.01.1991.16, however, expressly rescinded Executive Order 01.01.1989.05. *Dashiell,* 327 Md. at 132 n. 1, 607 A.2d 1249. "The new order changed the 1989 order by, among other

things, removing the automatic termination provision for sensitive employees who are convicted of a first-time, off-duty, alcohol-driving offense." *Id.* In place of the "automatic termination provision," the new Order sets forth a progressive schedule of discipline for sensitive employees who have been convicted of off-the-workplace alcohol driving offenses. Thus, the history of the Substance Abuse Policy, as expressed through the successive Executive Orders promulgating it, confirms an Executive goal of progressive discipline rather than termination upon a first offense.

Appellant also contends that the ALJ's interpretation of the Executive Order conflicts with our decision in *Curry v. Department of Public Safety and Corr'l Servs.*, 102 Md.App. 620, 628, 651 A.2d 390 (1994), *cert. granted,* 338 Md. 252, 657 A.2d 1182 (1995), *cert. dismissed,* 340 Md. 175, 665 A.2d 1038 (1995). In *Curry,* two correctional officers employed by the DPSCS were arrested away from the workplace for driving under the influence of alcohol. *Id.* at 623, 651 A.2d 390. After both officers were found guilty of that charge and granted probation before judgment, they were suspended for five days without pay. On appeal, the officers contended, among other things, "that their suspensions ... violate[d] the executive order by imposing the minimum penalties for a second offense [suspension for five days], even though each was a first-time offender." *Id.* at 633, 651 A.2d 390. In rejecting that argument, we stated that "[t]here is no indication that the sanctions listed in § (4)(a) [of the executive order] comprise an exclusive list of punishments that a state employer may impose." *Id.* "To the contrary," we noted, "the last sentence of § (4)(a) states that the employee shall be subject to 'any other appropriate disciplinary actions.'" *Id.* The officers also argued that the phrase "any other appropriate disciplinary actions" was so unconstitutionally vague as to violate due process. *Id.*

We found no merit to that argument, and explained that "[t]he term 'appropriate' adequately modifies the types of actions which may be imposed, so as to ensure that an employee will not receive a disproportionate disciplinary sanc-

tion." *Id.* at 634, 651 A.2d 390. "A five-day suspension for a first offense," we concluded, "is not an unduly harsh or disproportionate punishment to impose on an employee in a sensitive classification for an off-duty alcohol-related offense." *Id.*

*Curry,* however, is factually distinguishable from the case *sub judice.* In *Curry,* the penalty imposed was a five day suspension without pay, not termination. A suspension without pay for a first conviction does not contravene the Executive Order's policy of progressive discipline as termination does. Nor is it at odds with the plain language of the Order as termination is. The Executive Order, as noted earlier, specifically lists termination as a possible penalty for a second conviction, but not for a first. As the ALJ aptly pointed out, there is "only one reasonable interpretation" for this: termination is not an available sanction under the Executive Order for a sensitive employee's first off-the-workplace alcohol driving offense conviction. Accordingly, the ALJ's construction of the Executive Order is not, as appellant asserts, contrary to our interpretation of that Order in *Curry.*

Appellant also contends that because Executive Order 01.01.1991.16 requires that employees must be capable of performing their duties, "Beard's inability to perform his job effectively may properly result in discipline up to an including termination." We disagree.

Paragraph (B)(2) of the Executive Order states that "[a]ll employees in the workplace must be capable of performing their duties." The Order, however, does not contain any language that authorizes the termination of an employee for a first offense because that employee could not perform his or her duties. That Beard was a Drinking Driver Monitor who himself was convicted of driving under the influence of alcohol does not change this. To affirm Beard's termination would require that we disregard the plain language of the Order, and that we cannot do.

## III.

 Finally, appellant claims that the ALJ "exceeded his authority" by fashioning disciplinary sanctions rather than "remanding the matter to the appointing authority for an assessment of appropriate discipline." That claim is without merit.

SPP § 11–110 applies to employees in the skilled and professional services who appeal, as appellee did, disciplinary actions to the Secretary of Budget and Management. If the Secretary of Budget and Management refers the appeal to the Office of Administrative Hearings, § 11–110(d) authorizes an ALJ in that office to:

(i) uphold the disciplinary action; (ii) rescind or modify the disciplinary action taken and restore to the employee any lost time, compensation, status, or benefits; or (iii) order: 1. reinstatement to the position that the employee held at dismissal; 2. full back pay; or 3. both 1 and 2.

To carry out the provisions of § 11–110(d), the Secretary of Budget and Management adopted COMAR 17.04.05.02(C), which provides:

The Office of Administrative Hearings may not change the discipline imposed by the appointing authority, as modified by the head of the principal unit or Secretary, unless the discipline imposed was clearly an abuse of discretion and clearly unreasonable under the circumstances.

Upon holding that "the discipline proposed by the DPP" was "contrary to applicable State regulations and established agency policy" and therefore "an abuse of discretion" under COMAR 17.04.05.02(C), the ALJ fashioned sanctions that, in his view, comported with the provisions of the Substance Abuse Policy. Specifically, the ALJ reprimanded Beard and ordered that he be referred to the Employee Assistance Program. The ALJ also ordered that Beard be reinstated as a Monitor II in the Drinking Driver Monitor Program, and that he receive back pay "from April 1, 1999 up to and including the date of [the] decision." The ALJ conditioned Beard's reinstatement upon his compliance with any recom-

mendations made by the Employee Assistance Program and upon his demonstration, "to the satisfaction of the DPP, that he is abstaining from the use of any alcoholic beverages, his current participation in, or recent completion of, a certified alcoholic treatment program" and "his ongoing participation in Alcoholics Anonymous or another acceptable self-help group."

Contrary to appellant's contention, the ALJ did not exceed his authority by fashioning sanctions rather than remanding this matter to the DPP. Indeed, the actions of the ALJ were authorized by COMAR 17.04.05.02(C) and § 11–110(d). In accordance with COMAR 17.04.05.02(C) the ALJ stated that he was modifying the DPP's disciplinary action because that action was "contrary to applicable State regulations and established agency policy" and was therefore "an abuse of discretion." In compliance with § 11–110(d)(ii), the ALJ "modify[ed] the disciplinary action taken," by ordering that Beard be referred to the Employee Assistance Program and imposing various conditions upon his reinstatement. Finally, in accordance with § 11–110(d)(iii)(3), the ALJ ordered that Beard be reinstated with back pay. We conclude therefore that the ALJ acted well within his statutory authority in ordering Beard's reinstatement with back pay and imposing the sanctions that he did.

**JUDGMENT OF THE CIRCUIT COURT IS AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**